## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LISA WALL, | : | Civil No. 3:23-CV-00850 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| LELAND DUDEK,[1] | : | |
| Acting Commissioner of Social Security | : | (Magistrate Judge Carlson) |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

### I.    Introduction

For Administrative Law Judges (ALJs) Social Security disability decisions often entail an evaluation of the persuasive power of various medical opinions. An ALJ undertakes this task guided by regulations which call upon the ALJ to assess each medical opinion in terms of its consistency and supportability.

Once the ALJ has made this decision, on appeal it is the Court's responsibility to decide whether substantial evidence, fully articulated by the ALJ, supports the

---

[1] Leland Dudek became the Acting Commissioner of Social Security on February 16, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Leland Dudek should be substituted for the previously named defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

disability determination. This "substantial evidence" test is a highly deferential

standard of review. As the Supreme Court has explained:

> The phrase "substantial evidence" is a "term of art" used throughout
> administrative law to describe how courts are to review agency
> factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——,
> 135 S. Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-
> evidence standard, a court looks to an existing administrative record
> and asks whether it contains "sufficien[t] evidence" to support the
> agency's factual determinations. Consolidated Edison Co. v. NLRB,
> 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938) (emphasis
> deleted). And whatever the meaning of "substantial" in other contexts,
> the threshold for such evidentiary sufficiency is not high. Substantial
> evidence, this Court has said, is "more than a mere scintilla." Ibid.; see,
> e.g., Perales, 402 U.S. at 401, 91 S. Ct. 1420 (internal quotation marks
> omitted). It means—and means only—"such relevant evidence as a
> reasonable mind might accept as adequate to support a conclusion."
> Consolidated Edison, 305 U.S. at 229, 59 S. Ct. 206. See Dickinson v.
> Zurko, 527 U.S. 150, 153, 119 S. Ct. 1816, 144 L.Ed.2d 143 (1999)
> (comparing the substantial-evidence standard to the deferential clearly-
> erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019). Under this standard of review,

we are obliged to affirm the decision of the administrative law judge (ALJ) once we

find that it is "supported by substantial evidence, 'even [where] this court acting *de*

*novo* might have reached a different conclusion.'" Monsour Med. Ctr. v. Heckler,

806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting Hunter Douglas, Inc. v. NLRB, 804

F.2d 808, 812 (3d Cir. 1986)).

2

In the instant case we are called upon to decide whether substantial evidence, which was adequately articulated by the ALJ, supported the conclusion that the medical opinion of a non-treating consultant, Dr. Sarah Vanes, was less persuasive than two state agency expert opinions.  Mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" Biestek, 139 S. Ct. at 1154, we conclude that substantial evidence supported the ALJ's mental medical opinion findings in this case. Therefore, for the reasons set forth below, we will affirm the decision of the Commissioner denying this claim.

## II.    Statement of Facts and of the Case

### A. Background

The administrative record of Wall's disability application reveals the following essential facts: In August of 2021, Wall applied for  disability insurance and supplemental security income benefits pursuant to Titles II and XVI of the Social Security Act, alleging an onset of disability beginning November 16, 2020. (Tr. 29). According to Wall, she was completely disabled due to a number of physical and emotional impairments, including major depressive disorder; posttraumatic stress

disorder (PTSD); bipolar disorder; panic disorder; anxiety; and schizoaffective disorder, bipolar type. (Tr. 32).[2]

Wall was born on June 26, 1978, and was 42 years old on the alleged disability onset date, which defined her as a younger individual under the Commissioner's regulations. (Tr. 42). She had a limited school education and prior employment as a resident care aide and an assistant manager. (Tr. 41-42).

**B. Wall's Clinical History**

At the time of the alleged onset of her disability in November 2020, Wall was both incarcerated[3] and expecting the birth of a child. Following the birth of her child and her release from custody, Wall was treated through the Geisinger Health System for anxiety and depression. The records of this treatment revealed several consistent themes. Wall was repeatedly diagnosed as suffering from anxiety and depression.

---

[2] Wall's disability application also listed a number of physical impairments in addition to these emotional conditions. However, in this appeal Wall focuses exclusively upon the ALJ's consideration of her emotional impairments. Therefore, we will limit our discussion to these emotional impairments.

[3] Wall's incarceration was related to her prior employment as a resident care aide. According to her treatment records, in January of 2000 Wall was charged with abuse of a care dependent person after she was captured on video throwing food on the ground and then making a care dependent person pick up the discarded food and eat it. (Tr. 737-39, 743-46). Wall pleaded guilty to two misdemeanor charges in December of 2020 and was sentenced to home detention. (Tr. 750).

Her depression was consistently described as a moderate recurrent depressive disorder. While treatment notes indicated that Wall occasionally voiced fleeting thoughts of death and endorsed some suspicious and paranoid ideas, she was not deemed a risk of self-harm. Moreover, Wall often reported improvement in her symptoms when she adhered to her medication regime. Furthermore, the treatment notes contained numerous references to normal or benign findings describing her as fully oriented, with  normal mood, affect, behavior, appearance, speech, judgment and thought content.

Shortly after her state conviction and the birth of her child, on January 14, 2021, Wall was seen at Geisinger and was diagnosed with postpartum depression. (Tr. 710-11). At a June 3, 2011, clinical encounter Wall reported worsening depression, which was attributed in part to postpartum depression. (Tr. 699).  Her caregivers reported that her mental status was at baseline and described her condition as a moderate episode of recurrent depressive disorder. (Tr. 703).

On December 15, 2021, Dr. Sarah Vanes conducted a consultative examination of Wall as part of the disability determination process. (Tr. 948-54). At that time Wall reported that she was still on home detention following her state conviction. (Tr. 949). Wall described depression which "comes and goes" but denied any suicidal ideation. (Id.) Wall was cooperative throughout the examination, (Id.)

Her appearance was appropriate; her speech was fluent; she was fully oriented; and her thought processes were coherent and goal oriented. (Tr. 950). While she had a flat affect, and testing revealed some impairment of her memory, concentration and attention, her judgment and insight were both rated as fair. (Id.)

On January 22 and 28, 2022, Wall was seen at Geisinger. (Tr. 985-94). She was described as irritable, diagnosed as experiencing a moderate episode of major depressive disorder, and agreed to a psychological referral to Dr. Fran Angelella. (Tr. 990-94). However, caregivers noted that she was fully oriented and her mood, affect, and behavior were reported as normal. (Tr. 985-89). Records of Wall's clinical encounters with Dr. Angelella and her staff in February and March of 2022 indicated that Wall self-reported depression, mood swings, and anxiety. (Tr. 1026). However, Wall also stated that she felt a slight improvement in her symptoms when she took her medication. (Tr. 1027). Her affect was flat and her mood anxious, but her appearance, behavior, and cognition were rated within normal limits. (Id.) Wall was later described as neat in appearance, alert, engaged, cooperative and purposeful. (Tr. 1029). Her recent memory was considered moderately impaired, and her attention and concentration were impaired to a moderate to severe degree. (Id.) During a March 14, 2022, clinical encounter, Wall was fully oriented, but

voiced fleeting thoughts of death while stating that her mood was somewhat better when she took her medication. (Tr. 1038-42).

Wall reported similar symptoms, along with some suspicious and paranoid thoughts, during an April 11, 2022, medical appointment. (Tr. 1136). At that time, she was diagnosed with a moderate recurrent depressive disorder, and it was noted that her attention, speech, and behavior were all normal. (Tr. 1141). Ten days later, when she was seen for podiatric care, staff reported no evidence of depression or anxiety and Wall's mood, affect, judgment and thought content were considered normal. (Tr. 1188-89).

In May of 2022, Dr. Angelella described Wall's condition as stable, and recorded that she felt better when she took her medications. (Tr. 1064). Her appearance and behavior were found to be within normal limits. (Tr. 1065). Likewise, treatment notes from May 11, 2022, stated that Wall's affect, speech, and behavior were normal, and that she reported having more energy since she began her medication regime. (Tr. 1230-35). Her primary care physician assistant, Stephen Gitkos, made similar findings during a June 9, 2022, appointment. (Tr. 1324-28). While Wall continued to present as depressed, she stated that her medications were helpful. She was fully oriented, and her cognition, memory, attention, perception, speech, and behavior were normal. (Id.)

7

In July and August 2022, Wall experienced episodes of dizziness. (Tr. 1296, 1303-20). During her treatment encounters relating to these dizzy spells, it was noted that she experienced moderately severe recurrent major depressive disorder, with fleeting dark thoughts, but her speech, behavior, and attention were normal; she was fully oriented; and her mental status was at baseline. (Id.) She was assessed as negative for self-harm, and it was observed that she reported symptom improvement when she took her medications. (Id.)

## C. **The Medical Opinion Evidence.**

Given this clinical history, three medical sources opined regarding the degree to which Wall's emotional impairments were disabling. reaching starkly differing conclusions on this issue. At the outset, on December 15, 2021, Dr. Sarah Vanes, a consulting source, concluded based upon a one-time examination of Wall that she was mildly impaired in terms of her ability to understand and carry out simple instructions and moderately impaired when it came to carrying out more complex instructions. (Tr. 952). Dr. Vanes also found that Wall would experience marked limitations in interacting with others and adapting to workplace changes. (Tr. 953).

Two state agency experts who considered the same clinical evidence and had the benefit of Dr. Vanes' assessment, reached somewhat different conclusions. On December 23, 2021, Dr. Karen Plowman assessed Wall's mental residual functional

capacity. (Tr. 91-100). In this assessment, Dr. Plowman found that Wall was moderately impaired in terms of her ability to concentrate, persist, or maintain pace and understand, remember, or apply information. The doctor concluded that Wall was only mildly impaired with respect to her ability to interact with others and adapt or manage herself. (Tr. 93). According to Dr. Plowman, Wall's ability to understand, remember, and carry out detailed instructions as well as her ability to maintain attention and concentration for extended periods was also moderately impaired. (Tr. 98). However, she was not significantly limited in any other spheres of intellectual functioning. (Id.)

Dr. Plowman also specifically considered, and rejected, the more restrictive opinion of Dr. Vanes, stating:

> The findings of Dr. Vanes are not supported by the collateral MER or her own narrative. She endorsed marked impairments in the clmt's ability to interact with others and adapt to changes in the workplace. While the clmt reports some social anxiety, she does socialize, shops in stores and goes out into the community. Her ADLS are functional and she is caring for three young children. It appears the CE overestimated the clmt's limitations. The clmt is able to meet the mental demands for simple, one to two step tasks on a sustained basis despite the limitations associated with her impairments.

(Id.)

On reconsideration, Dr. Plowman's views were endorsed by a second state agency expert, Dr. Lisa Cannon. (Tr. 112-23). In March of 2022, Dr. Cannon found

9

that Wall was mildly impaired when it came to understanding, remembering, or applying information and adapting or managing herself. The doctor opined that she was moderately impaired in her ability to interact with others and concentrate, persist, or maintain pace. (Tr. 115). Dr. Cannon also specifically found that Wall "is able to meet the mental demands required for basic tasks on a sustained basis despite the limitations resulting from the claimant's impairment. [She] can understand, retain and follow one and two–step instructions." (Tr. 116). Finally, Dr. Cannon carefully considered the opinion of Dr. Vanes and found it to be only partially persuasive, observing that:

> [The] medical source statements in the report concerning the claimant's abilities in the areas of making occupational adjustments and making performance adjustments are fairly consistent with the other evidence in file. However, the source statements regarding the abilities in the areas of making personal and social adjustments and other work related activities are not consistent with all of the medical and non-medical evidence in the claims folder. The opinion is without substantial support from the other evidence of record, which renders it less persuasive.

(Id.)

It was against this medical background that Wall's case came to be considered by the ALJ.

D. **The ALJ Decision**

A hearing was conducted in Wall's case on July 20, 2022. (Tr. 49-85). Following this hearing, on September 29, 2022, the ALJ issued a decision in Wall's case. (Tr. 26-48). In that decision, the ALJ first concluded that Wall met the insured requirements of the Act through September 30, 2022, and had not engaged in substantial gainful activity since the alleged onset date of November 16, 2020. (Tr. 32). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Wall had the following severe emotional impairments: major depressive disorder; posttraumatic stress disorder (PTSD); bipolar disorder; panic disorder; anxiety; and schizoaffective disorder, bipolar type. (Id.)

At Step 3, the ALJ determined that Wall did not have an impairment or combination of impairments that met or medically equaled the severity of one of the disability listing impairments. (Tr. 32-36). This Step 3 determination rested upon a comprehensive review of Wall's medical history. As the ALJ explained:

> The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.03, 12.04, 12.06, and 12.15. In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in one extreme limitation or two marked limitations in a broad area of functioning. An extreme limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis. A marked limitation is a seriously limited ability to

11

function independently, appropriately, or effectively, and on a sustained basis.

In understanding, remembering or applying information, the claimant has a moderate limitation. The claimant alleges difficulties with understating and memory deficits (Exhibits 3E, 7E). However, she also reported that she does not need reminders to go places, care for her personal hygiene, or take medication (Exhibits 3E, 7E). Additionally, she reported that she is generally able to care for all of the needs of her children, prepare and cook simple meals, perform household chores, drive a motor vehicle, shop, and manage her personal finances (Exhibits 3E, 7E). A mental status examination in February 2022 notes moderate recent memory and the consultative examination describes below average cognitive functioning and somewhat limited fund of information (Exhibits 10F, 13F). However, the consultative examination also reflects only mildly impaired recent and remote memory skills and coherent and goal directed thought processes (Exhibit 10F). Additionally, treatment records otherwise generally reflect intact memory skills and normal cognition (Exhibits 14F, 18F). The consultative examiner opined that the claimant has mild limitation in understanding, remembering, and carrying out simple instructions; moderate limitation in understanding, remembering, and carrying out complex instructions and making judgments on simple work-related decisions; and marked limitation in making judgments on complex work-related decisions (Exhibit 10F). However, both State agency psychological consultants opined that the claimant has no more than moderate limitation in this functional domain (Exhibits 2A, 4A, 5A, 7A). As such, the evidence wholly supports the finding that the claimant's mental impairments cause no more than moderate limitation in understanding, remembering, or applying information.

In interacting with others, the claimant has a moderate limitation. The claimant did not allege any specific difficulties getting along with others (Exhibits 3E, 7E). However, she did report that she experiences difficulty leaving her home, social anxiety, and a loss of interest in going places (Exhibits 3E, 7E). Nevertheless, she also reported that she spends time with others and that she shops in stores (Exhibits 3E, 7E).

Moreover, she reported no difficulties getting along with authority figures and that she has never been fired from problems getting along with others (Exhibits 3E, 7E). The consultative examination describes cooperative attitude, adequate manner of relating, appropriate eye contact, fluent speech, well-groomed appearance, and no evidence of hallucinations, delusions, or paranoia (Exhibit 10F). Additionally, treatment records generally describe neat and well-groomed appearance, cooperative attitude, normal speech, normal behavior, and thought content without hallucinations, delusions, or homicidal ideations (Exhibits 13F, 16F, 18F). While the consultative examiner opined that the claimant has marked limitation in interacting with others, both State agency psychological consultants opined that the claimant has no more than moderate limitation in this functional domain (Exhibits 2A, 4A, 5A, 7A, 10F). As such, the evidence of record wholly supports the finding that the claimant's mental impairments cause no more than moderate limitation in interacting with others.

With regard to concentrating, persisting or maintaining pace, the claimant has a moderate limitation. The claimant alleges difficulties with concentration and completing tasks (Exhibits 3E, 7E). However, she reported that she is generally able to care for all of the needs of her children, prepare and cook simple meals, perform household chores, drive a motor vehicle, shop, and manage her personal finances (Exhibits 3E, 7E). The consultative examination describes impaired attention and concentration skills; however, it also notes coherent and goal directed thought process with normal thought content (Exhibit 10F). A mental status examination in February 2022 also reflects moderate attention and concentration (Exhibit 13F). However, more recent mental status examinations from April through July 2022 describe normal attention (Exhibits 16F, p. 75; 18F, p. 27, 39-40). No treating, examining, or reviewing source opined that the claimant has greater limitation in this functional domain (Exhibits 2A, 4A, 5A, 7A, 10F).

As for adapting or managing oneself, the claimant has experienced a mild limitation. The record is devoid of inpatient psychiatric hospitalizations, participation in a partial hospitalization program, or

emergency room visits during the period at issue. Additionally, the record is devoid of reported hallucinations, delusions, obsessions, or homicidal ideations or apparent difficulties with impulse control. While treatment records were positive for reported fleeting thoughts about death; however, the records consistently reflect no plan or intent (Exhibits 12F, 14F, 16F, 18F). Additionally, a mental status examination in April 2022 was positive for paranoid though content, but treatment records were otherwise devoid of the same and the consultative examination was negative for paranoia (Exhibits 10F, 13F, 12F, 14F, 16F, 18F). Other than those clinical abnormalities noted above, treatment records generally reflect variations in mood and affect, but are relatively devoid of significant clinical abnormalities (Exhibits 13F, 14F, 15F, 16F, 18F). Additionally, the consultative examination describes neutral mood, but flat affect and appropriate dress, well-groomed appearance, fluent speech with adequate expressive and receptive language skills, clear sensorium and full orientation, and coherent and goal directed thought process (Exhibit 10F). The claimant reported that she cares for all of her children's needs (Exhibit 7E). Moreover, the record reflects that the claimant can independently care for her personal hygiene, prepare and cook simple meals, wash laundry and perform some household chores, shop, manage money and drive (Exhibits 3E, 7E, 10F, 11F). There is no evidence of an inability to set realistic goals, make plans independent of others, travel to unfamiliar places, avoid normal hazards, or take appropriate precautions. While the consultative examiner opined that the claimant has limitations in adapting and managing oneself, she did not specify the extent of the same (Exhibit 10F). Additionally, both State agency psychological consultants opined that the claimant has no more than mild limitation in this functional domain (Exhibits 2A, 4A, 5A, 7A). As such, the evidence of record wholly supports the finding that the claimant's mental impairments cause no more than mild limitation in adapting or managing oneself.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied.

The undersigned has also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria. The claimant is capable of self-sustainment and the record reveals that the claimant is also capable of some adjustment to minor changes in mental demands. The claimant has not required psychiatric hospitalizations or emergency room visits for psychologically related symptoms and mental status examinations fail to show significant clinical abnormalities during the period at issue.

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment of the areas of mental functioning. The following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

(T. 33-36).

Between Steps 3 and 4, the ALJ then fashioned a residual functional capacity

("RFC") for the plaintiff which considered all of Wall's impairments as reflected in

the medical record, and found that:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that the claimant can never push/pull with the lower extremities or climb ladders, ropes, or scaffolds. The claimant is limited to occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling. The claimant must avoid concentrated exposure to extreme cold and heat, wetness, humidity, vibration, hazards, and fumes, odors, dusts, gases, poor ventilation, and other pulmonary irritants. The claimant is limited to work involving only

15

simple, routine tasks, involving only one to two-step instructions, but not at a production rate pace, and no more than simple work-related decisions. The claimant can tolerate no more than occasional changes in the work setting and is limited to occasional interaction with supervisors, coworkers, and the public.

(Tr. 36).

In fashioning this RFC, the ALJ considered the medical evidence, the expert opinions, and Wall's self-described limitations. (Tr. 36-41). This analysis specifically considered the clinical and opinion evidence as it related to Wall's emotional impairments. On this score, the ALJ noted that:

As for the claimant's alleged mental impairments, the evidence of record does not support greater limitations than those provided herein. Treatment records reflect a longitudinal history of mental impairments beginning prior to the alleged onset date (Exhibit 7F). However, the record is devoid of inpatient psychiatric hospitalizations, participation in a partial hospitalization program, or emergency room visits during the period at issue and the claimant's treatment has generally consisted of some limited outpatient counseling and psychotropic medication prescribed by her primary care physician (Exhibits 1F, 6F, 7F, 8F, 14F). Additionally, the record is devoid of reported hallucinations, delusions, obsessions, or homicidal ideations or apparent difficulties with impulse control. While treatment records were positive for reported fleeting thoughts about death; however, the records consistently reflect no plan or intent (Exhibits 12F, 14F, 16F, 18F). Additionally, a mental status examination in April 2022 was positive for paranoid thought content, but treatment records were otherwise devoid of the same and the consultative examination was negative for paranoia (Exhibits 10F, 13F, 12F, 14F, 16F, 18F). Otherwise, treatment records generally reflect variations in mood and affect, but fail to reflect significant clinical abnormalities to support greater limitations (Exhibits 13F, 14F, 15F, 16F, 18F).

16

(Tr. 38-39).

Given this clinical history the ALJ found that the state agency opinions regarding Wall's emotional RFC were generally persuasive, observing that:

> The State agency psychological consultant on initial review opined that the claimant could understand, remember, attend to, and complete simple tasks and that she could meet the mental demands for simple, one to two-step tasks on a sustained basis despite the limitations associated with her impairments (Exhibits 2A, 4A). The undersigned finds this opinion mostly persuasive, as the evidence of record is generally consistent with moderate mental functional limitations and does not rise to the level of marked or extreme limitations. More specifically, the consultative examination and treatment records from February 2022 reflect some attention and concentration, memory, and cognitive deficits, it also notes coherent and goal directed thought process, adequate expressive and receptive language skills, fluent speech, adequate manner of relating, and clear sensorium. Otherwise, treatment records generally note variations in mood and affect, but were otherwise devoid of significant clinical abnormalities to support greater mental functional limitations.
>
> The State agency psychological consultant on reconsideration opined that the claimant could understand and remember simple tasks; make simple decisions; carry out short, simple instructions; understand, retain, and follow simple instructions (i.e. perform/follow one and two-step tasks/instructions); and would not require special supervision in order to sustain a routine (Exhibits 5A, 7A). The undersigned finds this opinion mostly persuasive, as the evidence of record is generally consistent with moderate mental functional limitations and does not rise to the level of marked or extreme limitations. More specifically, the consultative examination and treatment records from February 2022 reflect some attention and concentration, memory, and cognitive deficits, it also notes coherent and goal directed thought process, adequate expressive and receptive language skills, fluent speech, adequate manner of relating, and clear sensorium. Otherwise, treatment

records generally note variations in mood and affect, but were otherwise devoid of significant clinical abnormalities to support greater mental functional limitations.

(Tr. 40).

The ALJ found Dr. Vanes' consultative examination opinion unpersuasive stating:

> As for supportability, while the consultative examination itself describes impaired attention and concentration skills, mildly impaired recent and remote memory skills, below average cognitive functioning, and somewhat limited fund of information, it was otherwise generally within normal limits. However, as for consistency, treatment records generally reflect variations in mood and affect, but were otherwise generally within normal limits. As such, the evidence, when considered in its entirety, including the claimant's reported daily activities, is inconsistent with the degree of limitation contained in the opinion.

(Tr. 41).

Having made these findings, the ALJ concluded that Wall was unable to perform her past relevant work but retained the ability to perform other jobs that existed in significant numbers in the economy. (Tr. 41-43). Accordingly, the ALJ denied Wall's claim of disability. (Id.)

This appeal followed. (Doc. 1). On appeal, Wall argues that the ALJ erred in finding that the medical opinion of a non-treating consultant, Dr. Sarah Vanes, was less persuasive than two state agency expert opinions. However, after a review of

the record, we find that substantial evidence supported the ALJ's decision in this case and therefore will affirm the decision of the Commissioner.

## III.    Discussion

### A.    Substantial Evidence Review – the Role of this Court

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record. See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision]

from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n,

383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is

supported by substantial evidence the court must scrutinize the record as a whole."

Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has recently underscored for us the limited scope of our

review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek, 139 S. Ct. at 1154.

The question before this Court, therefore, is not whether the claimant is

disabled, but rather whether the Commissioner's finding that he is not disabled is

supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his

decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000).

As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for
> his decision. 220 F.3d at 119. Conclusory statements . . . are
> insufficient. The ALJ must provide a "discussion of the evidence" and
> an "explanation of reasoning" for his conclusion sufficient to enable
> meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d
> 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ
> particular "magic" words: "Burnett does not require the ALJ to use
> particular language or adhere to a particular format in conducting his
> analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

## B.    Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); see also 20 C.F.R. §404.1505(a). To satisfy this requirement, a claimant must have a severe

physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy.  42 U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").  20 C.F.R. §404.1520(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC).  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1).  In making this assessment, the ALJ considers all of

the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §404.1545(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a

physician is misguided." Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has identified limitations that would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. Biller, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006); Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015). In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if

it is supported by substantial evidence. <u>Burns v. Barnhart</u>, 312 F.3d 113, 129 (3d Cir. 2002); <u>see also Metzger v. Berryhill,</u> No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), <u>report and recommendation adopted sub nom. Metzgar v. Colvin</u>, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); <u>Rathbun v. Berryhill</u>, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), <u>report and recommendation adopted</u>, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. <u>Mason</u>, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §404.1512(f); <u>Mason</u>, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory

26

explication of the basis on which it rests." <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. <u>Id.</u> at 706-07. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." <u>Schaudeck v. Comm'r of Soc. Sec.</u>, 181 F.3d 429, 433 (3d Cir. 1999).

### C.    <u>Legal Benchmarks for the ALJ's Assessment of Medical Opinions.</u>

Wall filed his disability application following a paradigm shift in the manner in which medical opinions were evaluated when assessing Social Security claims. Prior to March 2017, ALJs were required to follow regulations that defined medical opinions narrowly and created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy. However, in March of 2017, the Commissioner's regulations governing medical opinions changed in a number of fundamental ways. The range of opinions that ALJs were enjoined to consider were broadened substantially, and the approach to evaluating opinions was changed from a hierarchical form of review to a more holistic analysis. As one court has aptly observed:

> The regulations regarding the evaluation of medical evidence have been amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded.

According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." <u>Revisions to Rules Regarding the Evaluation of Medical Evidence</u> ("<u>Revisions to Rules</u>"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), <u>see</u> 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." <u>Id</u>. at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed the foundation of the treating source rule. <u>Revisions to Rules</u>, 82 Fed. Reg. 5844-01 at 5853.

An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." <u>Id.</u> at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." <u>Id.</u> at §§ 404.1520c(c)(2), 416.920c(c)(2).

> Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. Id. at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). Id. at §§ 404.1520c(b)(3), 416.920c(b)(3).

Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-0942 (ML), 2020 WL 5848776, at *5 (N.D.N.Y. Oct. 1, 2020).

Oftentimes, as in this case, an ALJ must evaluate various medical opinions. Judicial review of this aspect of ALJ decision-making is still guided by several settled legal tenets. First, when presented with a disputed factual record, it is well established that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). Thus, when evaluating medical opinions "the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Mason, 994 F.2d at 1066). Therefore, provided that the decision is accompanied by an adequate, articulated rationale, it is the province and the duty of the ALJ to choose which medical opinions and evidence deserve greater weight.

Further, in making this assessment of medical evidence:

An ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion. See Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015); Turner v. Colvin, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that "SSR 96–2p does not prohibit the ALJ from crediting some parts of a treating source's opinion and rejecting other portions"); Connors v. Astrue, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June 10, 2011). It follows that an ALJ can give partial credit to all medical opinions and can formulate an RFC based on different parts from the different medical opinions. See e.g., Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

Durden v. Colvin, 191 F.Supp.3d 429, 455 (M.D. Pa. 2016).

It is against these legal benchmarks that we assess the instant appeal.

## D.    The ALJ's Decision is Supported by Substantial Evidence.

In this setting, we are mindful that we are not free to substitute our independent assessment of the evidence for the ALJ's determinations. Rather, we must simply ascertain whether the ALJ's decision is supported by substantial evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, Richardson, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce, 487 U.S. at 565. Judged against these deferential standards of review, we find that substantial evidence supported the ALJ's evaluation of the medical opinion evidence regarding Wall's emotional impairments. Therefore, we will affirm this decision.

30

In this case, Wall challenges the substance of this medical opinion evaluation and assails the ALJ's articulation of the rationale behind this medical opinion evaluation. However, we find that when the ALJ's decision is read as a whole and in a commonsense fashion substantial evidence which is well set forth by the ALJ supports this decision.

On this score, with respect to medical opinions analysis:

> An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(2), 416.920c(c)(2).

Waltz v. Dudek, No. 3:24-CV-1020, 2025 WL 714382, at *10 (M.D. Pa. Mar. 5, 2025).

In this case, the ALJ's assessment of the persuasiveness of these medical opinions expressly addressed the issues of supportability and consistency. In this regard, the ALJ aptly noted that the state agency expert opinions are consistent with

one another, and with Wall's clinical history and activities of daily living. Moreover, substantial evidence in this clinical record supported the ALJ's reliance on these state agency opinions. This clinical history found that Wall experienced moderate episode of depression, but responded well to medication, and her treatment notes repeatedly found that Wall's speech, thought content, judgment, perception, and behavior were normal. There was no substantive error here.

The ALJ's decision, read as a whole, also clearly articulated the rationale for this medical opinion analysis. On this score, the Court of Appeals' decision in Hess v. Comm'r Soc. Sec., 931 F.3d 198, 214 (3d Cir. 2019) is instructive. In Hess, the appellate court described the degree of articulation required in this area, explaining that that an ALJ offers a valid explanation for a simple task RFC when the ALJ highlights factors such as "mental status examinations and reports that revealed that [the claimant] could function effectively; opinion evidence showing that [the claimant] could do simple work; and [the claimant]'s activities of daily living, which demonstrated that [s]he is capable of engaging in a diverse array of 'simple tasks[.]'" Hess v. Comm'r Soc. Sec., 931 F.3d 198, 214 (3d Cir. 2019). That is precisely what the ALJ did in this case. Fairly construed, that decision is grounded the clinical and medical opinion evidence, along with Wall's activities of daily living. While Wall

may have preferred a more fulsome explanation of this medical opinion evidence, the ALJ's recital is all that the law requires.

Finally, to the extent that Wall suggests that she should have been entitled to a judgment in her favor at Step 3 of this sequential analysis, she errs. At Step 3 of this sequential analysis, the ALJ is required to determine whether, singly or in combination, a claimant's ailments and impairments are so severe that they are *per se* disabling and entitle the claimant to benefits. As part of this step three disability evaluation process, the ALJ must determine whether a claimant's alleged impairment is equivalent to a number of listed impairments, commonly referred to as listings, that are acknowledged as so severe as to preclude substantial gainful activity. 20 C.F.R. § 416.920(a)(4)(iii); 20 C.F.R. pt. 404, subpt. P, App. 1; Burnett, 220 F.3d 112, 119.

In making this determination, the ALJ is guided by several basic principles set forth by the social security regulations and case law. First, if a claimant's impairment meets or equals one of the listed impairments, the claimant is considered disabled *per se* and is awarded benefits. 20 C.F.R. § 416.920(d); Burnett, 220 F.3d at 119. However, to qualify for benefits by showing that an impairment, or combination of impairments, is equivalent to a listed impairment, a plaintiff bears the burden of presenting "medical findings equivalent in severity to *all* the criteria

33

for the one most similar impairment." Sullivan v. Zebley, 493 U.S. 521, 531 (1990);

20 C.F.R. § 416.920(d). An impairment, no matter how severe, that meets or equals

only some of the criteria for a listed impairment is not sufficient. Id.

The determination of whether a claimant meets or equals a listing is a medical

one. To be found disabled under step three, a claimant must present medical

evidence or a medical opinion that his or her impairment meets or equals a listing.

On this score, however, it is also clearly established that the ALJ's treatment of this

issue must go beyond a summary conclusion, since a bare conclusion "is beyond

meaningful judicial review." Burnett, 220 F.3d at 119. Thus, case law "does not

require the ALJ to use particular language or adhere to a particular format in

conducting his analysis. Rather, the function . . . is to ensure that there is sufficient

development of the record and explanation of findings to permit meaningful

review." Jones, 364 F.3d at 505. This goal is met when the ALJ's decision, "read as

a whole," id., permits a meaningful review of the ALJ's Step 3 analysis. Judged

against these guideposts, the extensive Step 3 analysis engaged in by the ALJ in this

case, which was supported by substantial clinical and medical opinion evidence,

demonstrated that Wall had not met the exacting standard necessary for a Step 3

finding of *per se* disability. Therefore, this argument also fails.

In closing, the ALJ's assessment of the evidence in this case complied with

the dictates of the law and was supported by substantial evidence. This is all that the law requires, and all that a claimant can demand in a disability proceeding. Therefore, we are obliged to affirm this ruling once we find that it is "supported by substantial evidence, 'even [where] this court acting *de novo* might have reached a different conclusion.'" <u>Monsour Med. Ctr. v. Heckler</u>, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting <u>Hunter Douglas, Inc. v. NLRB</u>, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we find that substantial evidence supported the ALJ's evaluation of this case and affirm the decision of the Commissioner.

## IV.   <u>Conclusion</u>

For the foregoing reasons, the decision of the Commissioner in this case will be affirmed, and the plaintiff's appeal denied.

An appropriate order follows.

<i><u>S/ Martin C. Carlson</u></i><br>Martin C. Carlson<br>United States Magistrate Judge

DATED: April 3, 2025